UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| CITY OF PHILADELPHIA PUBLIC EMPLOYEES RETIREMENT SYSTEM derivatively on behalf of CHIQUITA BRANDS INTERNATIONAL, INC. <br><br> Plaintiff, <br><br> v. <br><br> FERNANDO AGUIRRE, MORTEN ARNTZEN, JEFFREY D. BENJAMIN, ROBERT W. FISHER, CYRUS F. FREIDHEIM, JR., CLARE M. HASLER, RODERICK M. HILLS, DURK I. JAGER, JAIME SERRA, and STEVEN P. STANBROOK, <br><br> Defendants, <br><br> -and- <br><br> CHIQUITA BRANDS INTERNATIONAL, INC., <br><br> Nominal Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

CASE NO: 1:07-cv-851
JUDGE Dlott

**JURY TRIAL DEMANDED**

## VERIFIED SHARHOLDER'S DERIVATIVE COMPLAINT

For its Verified Shareholders' Derivative Complaint, plaintiff alleges the following upon personal knowledge as to itself, and upon information and belief as to all other allegations, based upon its attorneys' investigation of information pertinent to the claims herein alleged:

## NATURE OF THE ACTION

1.      This is a shareholders' derivative action brought pursuant to Federal Rule of Civil Procedure 23.1 on behalf of nominal defendant Chiquita Brands International, Inc. ("Chiquita" or the "Company"), against the current members of the Company's Board of Directors, certain former Directors, and certain former officers and employees of Chiquita. Plaintiff seeks injunctive and other relief against defendants for repeated breaches of fiduciary duties owed to

Chiquita arising out of the Company's repeated and systematic violations of federal law prohibiting transactions with recognized global terrorist organizations. These breaches of fiduciary duty, along with the resultant violations of federal law, have substantially injured the Company.

2.      As current or past directors and/or officers of Chiquita, each of the Director Defendants (as defined herein) owe and have owed Chiquita and its shareholders the fiduciary duties of loyalty and due care in the management and administration of the Company's affairs. The Director Defendants' conduct, as more fully described herein, involves a conscious disregard for their obligations as directors and officers of the Company.  Among other things, the Director Defendants failed to (a) ensure that the Company abstained from committing willful and knowing illegal acts, (b) remain informed as to Chiquita's operations in Colombia after being told by Company lawyers that illegal payments were being made by the Company through its Colombian subsidiary, (c) take reasonable steps to ensure that the illegal practice had stopped, and (d) properly report the violations to the appropriate law enforcement officials.

3.      Chiquita is a publicly traded, multinational corporation headquartered in Cincinnati, Ohio and incorporated in New Jersey.  Chiquita is in the business of producing, distributing, and marketing bananas and other produce throughout North America and Europe. The Company wholly-owned and operated, at all relevant times herein, *C.I. Bananos de Exportacion S.A.* ("Banadex"), a foreign subsidiary in Colombia, South America.  Banadex produced bananas in the Uraba and Santa Marta regions of Columbia.  By 2003, Banadex was Chiquita's most profitable banana business.  Chiquita sold Banadex in June 2004.

4.      As detailed herein, the Defendants knowingly approved a course of sustained and systematic payments to terrorists located in Columbia, South America.  Between 1989 and 1997,

Chiquita paid money to the violent, left-wing terrorist organizations *Fuerzas Armadas Revolucionarios de Columbia* ("FARC") and *Ejercito Nacional de Liberacion* ("ELN"). From 1997 through February 4, 2004, the Company also made at least 100 cash payments to the *Autodefensas Unidas de Colombia* ("AUC"), a violent paramilitary organization operating in Columbia. The United States Secretary of State designated the AUC as a Foreign Terrorist Organization ("FTO") on September 10, 2001, and again on September 10, 2003. Since September 10, 2001, it has been a federal crime for Chiquita to knowingly provide material support and resources, including currency and monetary instruments, to the AUC.

5.  Pursuant to Executive Order 13224, on October 31, 2001, President Bush also designated the AUC as a "Specially-Designated Global Terrorist" ("SDGT"). Accordingly, since at least that date, it has been a federal crime for Chiquita to have willfully engaged in transactions with the AUC, without first receiving a license from the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC"). At all relevant times, Chiquita failed to obtain such a license.

6.  As detailed herein, current and former directors and/or officers of the Company allowed it to continue to pay the AUC even after the Director Defendants knew that Chiquita was violating the law and could face substantial monetary fines and criminal liability in connection with its misconduct.

7.  Jonathan Malis, the United States Department of Justice ("DOJ") Trial Attorney in the Counterterrorism Section who helped prosecute Chiquita, called Chiquita's conduct "morally repugnant" in a news report published in the *McClatchy Newspapers* on September 17, 2007. As quoted in that news report, Malis stated that "[t]he charges that Chiquita provided material support to a terrorist organization uncovered a grim underworld of corporate protection

3

money given to Colombian armed groups accused of massive kidnappings, killings and displacement of innocent civilians."

8.      On March 13, 2007, the Government charged Chiquita with the federal crime of Engaging in Transactions with a Specifically Designated Global Terrorist, namely the AUC. On that same day, Chiquita pled guilty to one count of knowingly Engaging in Transactions with a Specifically Designated Global Terrorist in violation of 50 U.S.C. § 1705(b) and 31 C.F.R. § 594.204. A copy of the agreement between Chiquita and the Department of Justice (the "Plea Agreement") is attached hereto as Exhibit A, and incorporated herein by reference. As part of the Plea Agreement, the Company was required to, and did, admit to facts contained in a Factual Proffer prepared by the government (the "Factual Proffer"), which is attached hereto as Exhibit B and incorporated herein by reference.

9.      Chiquita admitted as true all of the facts contained in the Factual Proffer. As part of the Plea Agreement, Chiquita also agreed to pay $25 million in five (5) annual installments through the year 2011 in equal payments of $5 million dollars, plus post-judgment interest. The Company also agreed to a five-year term of probation and is required to implement and maintain an effective compliance system to ensure that the wrongdoing it engaged in does not occur again. The Company also agreed to cooperate with any ongoing investigation against individuals involved in these transactions and to create a permanent office of corporate compliance and ethics.

10.      On September 11, 2007, the DOJ filed a Sentencing Memorandum in connection with the Company's appearance at a sentencing hearing held on September 17, 2007 (the "Sentencing Memorandum"). The Sentencing Memorandum, attached hereto as Exhibit C and incorporated herein by reference, contains a stunning indictment of Chiquita's conduct and the

conduct of the Director Defendants. Among other things, the Sentencing Memorandum states that Chiquita paid the AUC *even after*:

> "[T]he payments were brought directly to the attention of its senior executives during a Board meeting held in September 2000 . . . .
>
> [T]he United States designated the AUC as Foreign Terrorist Organization on September 10, 2001, and as a Specially-Designated Global Terrorist on October 30, 2001 . . . .
>
> [G]aining direct knowledge of the AUC's designation as a Foreign Terrorist Organization in September 2002 . . . .
>
> [I]ts outside counsel emphatically and repeatedly advised the Company, beginning in late February 2003, to stop the payments . . . .
>
> Department of Justice officials admonished the Company, on April 24, 2003, that the payments were illegal and could not continue . . . .
>
> [T]he same outside counsel advised the Company, on September 8, 2003, that the Department of Justice had given no assurances that the Company would not be prosecuted for making the payments . . . .
>
> [O]ne of its directors acknowledged in an internal email, on December 22, 2003, that 'we appear [to] be committing a felony.'"

11. The wrongdoing detailed in the Government's case, to which Chiquita has pled guilty, was not misconduct perpetrated at the bottom levels of the Company hidden from the view of senior managers and directors. On the contrary, according to the Sentencing Memorandum, "Chiquita's payments to the AUC were reviewed and approved by senior executives of the corporation, *including high-ranking officers, directors, and employees . . . . . [i]t was particularly important to make clear that the conduct that led to the Company's guilty plea was not the act of a rogue employee or mid-level manager*." (Emphasis added). The systematic, continuous, and conscious decisions taken by the Director Defendants to make payments to a murderous terrorist organization constitutes, beyond question, a serious and

substantial violation of the Director Defendants' fiduciary duties of loyalty and good faith to the Company's shareholders.

12.     The seriousness of the offense to which Chiquita pled guilty cannot be underestimated.  According to the Sentencing Memorandum, the DOJ believes that "Chiquita's financial support to the AUC was prolonged, steady, and substantial.  Defendant Chiquita paid the AUC on roughly a monthly basis for over six years.  Defendant Chiquita's payments to the AUC were typically in amounts equivalent to tens of thousands of U.S. dollars, and in the end totaled in excess of $1.7 million.  The money that defendant Chiquita paid to the AUC (and to the FARC and the ELN before that) was put to whatever use the terrorists saw fit.  Money is fungible.  *Regardless of the Company's motivations, defendant Chiquita's money helped buy weapons and ammunition used to kill innocent victims of terrorism.  Simply put, defendant Chiquita funded terrorism*."  (Emphasis added).

13.     On September 17, 2007, the Court accepted the Company's Plea Agreement with the Government.  The Company's troubles and the damage the Director Defendants have caused the Company, however, are just beginning.  During the summer, the victims of killings and torture perpetrated by the AUC and paid for by Chiquita, brought three separate lawsuits (unrelated to this Action) under the Alien Tort Claims Act and other federal statutes to recover against the Company for among other things sponsoring terrorism.  The lawsuits were all brought on behalf of the family members of trade unionists, banana workers, political organizers, social activists, and others who were killed and tortured by the AUC.

14.     According to the allegations made in a class action complaint brought in the United States District Court for the District of New Jersey captioned *Does v. Chiquita Brands International*, Case No. 07-cv-3406, the AUC murdered over 3,700 people in the banana-

growing region of Urabá alone between 1996 and 2004 during the time the Company admittedly paid the AUC. The complaint further alleges that Chiquita facilitated the transfer of weapons to the AUC and the transfer of illegal drugs from the AUC to overseas markets. A similar allegation appears in the class action complaint filed in the Federal District Court of Washington, D.C. captioned *Does v. Chiquita Brands International, Inc.*, Case No 1:07-cv-01048-PLF. That complaint, citing a 2003 report of the Organization of American States and testimony of the Columbian chief federal prosecutor's office, alleges that in November 2001, a Banadex ship smuggled 3,000 AK-47 assault rifles and more than 2.5 million bullets into Columbia for the AUC's use. All of the lawsuits seek hundreds of millions of dollars from Chiquita including treble damages.

15.    Moreover, the government of Columbia may take independent action against Chiquita and some of the Director Defendants. According to a press report in the *Associated Press* dated September 18, 2007, a criminal investigation is ongoing in Columbia against Chiquita and certain senior executives. According to the *Associated Press*, Columbia might seek to extradite the executives to stand trial in Columbia.

16.    In addition, private organizations in Columbia have apparently mobilized against Chiquita. As reported by the *Associated Press*, an organization called the National Victims' Movement, the largest Columbian representative of the victims of paramilitary violence, are seeking to have the Columbian Trade and Commerce Ministry withdraw all commercial licenses granted to Chiquita and its subsidiaries to prevent the Company from ever doing business in Columbia again.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over the subject matter of this action under and pursuant to 28 U.S.C. § 1332(a) because this action is an action for, *inter alia,* damages in excess of $75,000, exclusive of interest and costs, and there is complete diversity of citizenship.

18.     This action is not a collusive one to confer jurisdiction on a Court of the United States that it would not otherwise have.

19.     Venue is proper in this District because Chiquita is incorporated in this District.

## THE PARTIES

20.     Plaintiff is the City of Philadelphia Public Employee Retirement System.  Plaintiff currently holds 19,261 shares of Chiquita common stock, and it has continuously owned shares in Chiquita at all times relevant to this action.  Plaintiff brings this action derivatively in the right and for the benefit of Chiquita.  Plaintiff will fairly and adequately represent the interests of Chiquita and its shareholders in enforcing the rights of the Company.  Plaintiff is a citizen of Pennsylvania.

21.     Nominal defendant Chiquita is a leading international marketer and distributor of high-quality fresh and value-added food products from bananas and other fruits to nutritious blends of convenient green salads.  The Company is a publicly traded, multinational corporation headquartered in Cincinnati, Ohio and incorporated in the state of New Jersey.  Chiquita is a citizen of Ohio and New Jersey.

22.     Defendant Fernando Aguirre ("Aguirre") has served as the Chairperson of Chiquita's Board of Directors, President, and CEO since January 2004.  As such, Aquirre had specific knowledge of the underlying misconduct described herein but made the decision not to

take any action against the individuals responsible for such misconduct including the other individual defendants named herein. Aquirre is a citizen of Ohio.

23. Defendant Morten Arntzen ("Arntzen") has been a member of Chiquita's Board of Directors since March 2002 and has served on the Audit Committee since 2002. As a member of Chiquita's Audit Committee during the Company's repeated violations of federal law against SDGT Transactions, Arntzen was directly responsible for overseeing the review of Company financial statements, accounting policies, and internal controls and providing oversight of the Company's Corporate Responsibility program. Arntzen is a Citizen of New York.

24. Defendant Robert W. Fisher ("Fisher") has been a member of Chiquita's Board of Director since March 2002. Fisher served as Chiquita's Acting Chief Operating Officer from March 2002 to August 2002 and as a member of the Company's Executive Committee since 2003 (when the Company engaged in repeated SDGT Transactions in violation of federal law) up to 2004. Fisher is a citizen of California.

25. Defendant Clare M. Hasler ("Hasler") has been a member of Chiquita's Board of Directors since October 2005. As such, Hasler had specific knowledge of the underlying misconduct described herein but made the decision not to take any action against the individuals responsible for such misconduct including the other individual defendants. Hasler is a citizen of California.

26. Defendant Durk I. Jager ("Jager") has been a member of Chiquita's Board of Directors since December 2002. From December 2002 to February 2004, Jager served as a director while the Company violated federal law by engaging in SDGT Transactions. Jager is a citizen of Ohio.

9

27.    Defendant Jaime Serra ("Serra") has been a member of Chiquita's Board of Directors since January 2003.  From January 2003 to February 2004, Serra served as a director while the Company violated federal law by engaging in SDGT Transactions.  Serra is a citizen of Mexico.

28.    Defendant Steven P. Stanbrook ("Stanbrook") has been a member of Chiquita's Board of Directors and has served on the Audit Committee since December 2002.  As a member of Chiquita's Audit Committee during the Company's repeated violations of federal law against SDGT Transactions, Stanbrook was directly responsible for overseeing the review of Company financial statements, accounting policies, and internal controls and providing oversight of the Company's Corporate Responsibility program.  Stanbrook is a citizen of Wisconsin.

29.    Defendants Aguirre, Arntzen, Fisher, Hasler, Jager, Serra, and Stanbrook are hereinafter collectively referred to as the Current Director Defendants.

30.    Defendant Jeffrey D. Benjamin ("Benjamin") was a member of Chiquita's Board of Directors and served on the Audit Committee from March 2002 until he resigned on February 6, 2007.  From early 2002 until February 2004, he served alongside Roderick M. Hills ("Hills") on the Audit Committee.  As a member of Chiquita's Audit Committee, Benjamin was directly responsible for overseeing the review of Company financial statements, accounting policies, and internal controls and providing oversight of the Company's Corporate Responsibility program. Benjamin is a citizen of New York.

31.    Defendant Hills was a member of Chiquita's Board of Directors and Chairman of its Audit Committee from early 2002 until May 24, 2007 when he retired from the Board.  Hills was Chairperson of the Audit Committee from early 2002 until February 2004.  Soon after the Company announced that it had pled guilty to engaging in SDGT Transactions and that it agreed

to pay $25 million in fines, Hills announced his retirement from the Board of Directors. As Chairman of the Company's Audit Committee, Hills was directly responsible for reviewing the Company's financial statements, accounting policies, and internal controls and for providing oversight of the Company's Corporate Responsibility program. Hills is a citizen of Washington, D.C.

32. Defendant Cyrus F. Freidheim, Jr. ("Friedheim") served as the Company's CEO and the Chairperson of Chiquita's Board of Directors from March 2002 until January 10, 2004 when he became non-executive Chairman of the Board upon the election of Aguirre as President and CEO on that date. He also served as President from May 2002 until January 10, 2004. Friedheim retired as Chairman in May 2004. Friedheim is a citizen of Illinois.

33. Defendants Benjamin, Hills, and Friedheim shall hereinafter be referred to as the Prior Director Defendants.

34. The Current Board Defendants and the Prior Board Defendants shall hereinafter be referred to collectively as the "Director Defendants."

35. Due to their positions as current or former officers and/or directors of Chiquita and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its shareholders the fiduciary obligations of loyalty and due care. The Director Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders to benefit all shareholders equally, rather than to further their personal interests or other interests. Each director and officer of Chiquita owes a fiduciary duty to the Company and its shareholders to exercise good faith and diligence in the administration of the affairs of the Company.

36.     To discharge their duties, the Director Defendants are required to exercise reasonable and prudent oversight and supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the Director Defendants were and are required to, among other things:

a.     Manage, conduct, supervise, and direct the business affairs of Chiquita in accordance with all applicable laws (including federal and state laws, government rules and regulations and the charter and bylaws of Chiquita);

b.     Neither violate nor knowingly permit any officer, director or employee of Chiquita to violate applicable laws, rules, and regulations;

c.     Remain informed as to the status of Chiquita's operations, including foreign operations and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

d.     Establish and maintain systematic and accurate records and reports of the business and affairs of Chiquita and procedures for the reporting of the business and affairs to the Board of Directors and to periodically investigate, or cause independent investigation to be made of, said reports and records; and

e.     Maintain and implement an adequate, functioning system of internal controls, such that Chiquita's affairs and operations would be conducted in accordance with all applicable laws, rules, and regulations.

37.     The Director Defendants, in light of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and indirectly, exercise control over the criminal acts described herein.  That conduct involves knowing, willful, and

repeated criminal violations and obligations as officers and directors of Chiquita. Furthermore, Chiquita's Board effectively ratified the illegal conduct of Chiquita's officers, employees, and Defendant Hills by consciously failing to take any legal action on behalf of the Company against them and by permitting Hills to remain on the Board and retire his service from the Company

38.     Each Defendant herein is sued individually as a conspirator, aider, and abettor, as well as in his or her capacity as a present or past officer and/or director of Chiquita, and the liability of each arises from the fact that each has engaged in all or part of the unlawful acts, schemes, procedures, or transactions described of herein.

## THE DIRECTOR DEFENDANTS' FIDUCIARY DUTIES
## TO CHIQUITA AND ITS SHAREHOLDERS

39.     According to the Factual Proffer , beginning in 1989 through 1997, Chiquita made payments to left-wing terrorists organizations, namely the FARC and the ELN, in areas of Colombia, South America, where Chiquita, through Banadex, maintained banana-producing operations. The Factual Proffer states that in October of 1997, both FARC and ELN were designated as FTOs.

40.     According to the Factual Proffer, in 1997 following a meeting between Banadex's then-General Manager and the leader of AUC, Carlos Castaño, Chiquita – through Banadex – began making payments to AUC in exchange for what the Company has described as "security services." Chiquita admitted in the Factual Proffer that Castaño told Banadex at the meeting that the AUC was about to drive the FARC out of the banana producing region of Columbia where Chiquita was doing business.

41.     Castaño told Banadex to begin making payments to the AUC through associated private security companies called "convivirs." According to the Factual Proffer, Chiquita paid the AUC in checks drawn on the Columbian subsidiary of Chiquita listing convivirs as the

payee(s). The Factual Proffer states that the Company never received any security services from the convivirs. According to the Factual Proffer, Chiquita recorded the payments on its corporate books and records as "security payments" or payments for "security" or "security services." According to the Sentencing Memorandum, the amounts Chiquita was required to pay depended on its output of bananas. The Sentencing Memorandum states "Chiquita's payments to the AUC were reported to the Audit Committee of the Board of Directors *on a quarterly basis*." (Emphasis added).

42.    According to the Sentencing Memorandum, Chiquita and Banadex knew the payments were "illicit" from the beginning. According to the Sentencing Memorandum, "in early 1997, according to a contemporaneous, written account, one officer of defendant Chiquita remarked about the payments: 'Cost of doing business in Colombia - maybe the question is not why are we [Chiquita] doing this but rather why we [Chiquita] are in Colombia and do we [Chiquita] want to ship bananas from Colombia.'" The Sentencing Memorandum also states that "in June 1997, a senior officer of Banadex approved a convivir payment with the written comment: 'No alternative. But next year needs to be less.'"

43.    According to the Factual Proffer, in September 2000, members of Chiquita's Board of Directors became aware of the payments to the AUC and that the AUC was a "violent, paramilitary organization led by Carlos Castaño." According to the Factual Proffer, Chiquita's in-house counsel prepared a memorandum detailing an investigation of the payments. The Sentencing Memorandum states that the internal memorandum "made clear that the convivir was merely a front for the AUC and described the AUC as a 'widely-known, illegal vigilante organization.'"

44. Chiquita's in-house counsel presented the results of the investigation and the memorandum to the Audit Committee of Chiquita's Board during a meeting held in Cincinnati, Ohio in September 2000. As the Sentencing Memorandum recounts, "[a]ccording to contemporaneous notes of the meeting, defendant Chiquita's ongoing payments to the AUC were described as 'not a voluntary decision (extortion)' and Carlos Castaño was named as the 'convivir leader.' According to the notes, one director responded to the presentation by asking: 'Can we reduce [the] amount per box?'" Nonetheless, the payments continued without anyone at the Company notifying the authorities.

45. As discussed above, approximately one year later, on September 10, 2001, the United States Department of State designated AUC as a SDGT. This designation made it illegal to knowingly provide financial support to the organization without first receiving a license from the United States Department of the Treasury. According to the Factual Proffer, Chiquita knew about the SDGT designation. Chiquita admitted in the Factual Proffer that news reports of the designation were widely published in the press on or about October 6, 2001, including in Cincinnati newspapers and in a proprietary database to which Chiquita subscribed. That database, according to the Factual Proffer, in a posting accessed by a Chiquita employee on September 30, 2002, stated, among other things, that the State Department had designated the AUC as a terrorist organization "barring US companies from contact with the personnel accused of AUC connections." Despite this designation and the press coverage it received, Chiquita continued making payments to AUC through the remainder of 2001 and beyond.

46. According to the Sentencing Memorandum, in late March of 2002, as the Company was emerging from Chapter 11 Bankruptcy, the AUC began to demand cash payments. The Sentencing Memorandum states that by June 2002, senior Chiquita officers

established new procedures and began keeping a "private ledger of these cash payments." The Sentencing Memorandum states that the Audit Committee reviewed the procedures at a meeting on April 23, 2003.

47.     According to the Factual Proffer, in February 2003, an undisclosed high-ranking officer of the Company spoke to outside counsel regarding the payments. Outside counsel advised the Company, through this undisclosed officer, that the payments were illegal under United Sates law and that Chiquita should immediately stop paying AUC directly or indirectly. The Factual Proffer and the Sentencing Memorandum cites the following communications from counsel regarding the illegality of the payments:

- "Must stop payments." (Notes, dated February 21, 2003).

- "Bottom Line: CANNOT MAKE THE PAYMENT"; Advised NOT TO MAKE THE ALTERNATIVE PAYMENT through CONVIVIR;" "General Rule: cannot do indirectly what you cannot do directly;" "Concluded with: CANNOT MAKE THE PAYMENT" (Memo, dated February 26, 2003).

- "You voluntarily put yourself in this position. Duress defense can wear out through repetition. Buz [business] decision to stay in harm's way. Chiquita should leave Colombia." (Notes, dated March 10, 2003).

- "[T]he company should not continue to make the Santa Marta payments, given the AUC's designation as a foreign terrorist organization" (Memo, dated March 11, 2003)

48.     According to the Factual Proffer and the Sentencing Memorandum, on or about April 3, 2003, an unnamed director reported to the entire Board that Chiquita was making payments to a foreign terrorist organization. One of the directors objected to the payments and suggested that they be disclosed to the DOJ.

49.     The next day on April 4, 2003, according to the Sentencing Memorandum, the Company's outside counsel's contemporaneous notes cite a "senior officer of defendant Chiquita" who purportedly said: "'His and [a director's] opinion is just let them sue us, come

16

after us. This is also [a senior officer's] opinion.'" Consistent with that instruction, as the Sentencing Memorandum states, "[f]our days later, senior officers of defendant Chiquita instructed their subordinates to 'continue making payments' to the AUC."

50.     As the Factual Proffer states, on April 24, 2003, an undisclosed director and officer met with the DOJ and disclosed the payments. According to the Factual Proffer and the Sentencing Memorandum, the DOJ told the Chiquita senior officers who were present that "the payments were illegal and could not continue." According to the Sentencing Memorandum, the DOJ also stated at the meeting, "as [Chiquita's] outside counsel had warned earlier, that the situation that Chiquita described [was] not a case of true duress because Banadex has a legal option – to withdraw from Columbia." An article appearing in *The New York Times* on August 16, 2007, named defendant Hills as a participant in that meeting.

51.     Despite these warnings from the DOJ, according to the Factual Proffer and the Sentencing Memorandum, a Chiquita employee told others at Chiquita to "continue making payments." The Sentencing Memorandum states that Chiquita made a cash payment to the AUC within a week and the payments continued.

52.     The DOJ continued to have contact with senior Chiquita officers through September 2003. According to the Sentencing Memorandum, "[i]n a memorandum dated September 8, 2003, outside counsel summarized defendant Chiquita's various contacts with the Department of Justice from April 2003 through September 2003."

53.     According to the memorandum cited in the Sentencing Memorandum, "[o]utside counsel noted that: '[Department of Justice] officials have been unwilling to give assurances or guarantees of non-prosecution; in fact, officials have repeatedly stated that they view the circumstances presented as a technical violation and cannot endorse current or future

payments.'" The Sentencing Memorandum states that "[s]enior officers of defendant Chiquita received copies of this memorandum."

54.     The Sentencing Memorandum concludes, "[s]enior officers and directors of defendant Chiquita were well aware that the Company was continuing to pay a federally-designated Foreign Terrorist Organization and that the Company was subject to criminal prosecution for its continuing conduct."

55.     According to the Factual Proffer, on December 4, 2003, the full Board received more information about the payments to the AUC. According to the Factual Proffer and the Sentencing Memorandum, one of the Director Defendants responded by stating: "I reiterate my strong opinion – stronger now – to sell our operations in Colombia."

56.     The Factual Proffer recounts that on December 22, 2003, one of the Director Defendants sent an email to the entire Board stating that "[t]his is not a management investigation. This is an audit committee investigation. It is an audit committee investigation because we appear to [be] committing a felony." According to the Sentencing Memorandum, "a week later, according to a contemporaneous account of the conversation, that same director told outside counsel for the Audit Committee that 'Chiquita is knowingly violating the law.'"

57.     Despite their actual knowledge of the wrongdoing, the Director Defendants continued to authorize the payments to the AUC. According the Factual Proffer and the Sentencing Memorandum, these payments continued until a check cleared on February 4, 2004, which as the Sentencing Memorandum states, was issued no January 29, 2004. The payments were discontinued, according to the Sentencing Memorandum, after Aguirre became CEO of the Company. Nonetheless, Aguirre did nothing to remediate Chiquita's past conduct. Neither Aguirre nor any other member of the Board (including defendant Hasler who became a Board

member in October 2005) took any action to discipline any Chiquita officer and/or director for any misconduct related to the Company's payments to the terrorist organizations.

58. The facts pled herein and contained in the Factual Proffer and the Sentencing Memorandum establish that top members of Chiquita's management and Board knowingly caused the Company to violate federal law. All told, the Company made 50 payments to AUC following its designation as a specially designated global terrorist organization totaling in excess of $825,000.

## DERIVATIVE ALLEGATIONS

59. Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

60. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered by the Company because of the breaches of fiduciary duty by the Director Defendants.

61. Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights, and they have retained counsel experienced in litigating these types of actions.

62. Plaintiff is an owner of Chiquita shares and was an owner of Chiquita stock during all times relevant to the Director Defendants' wrongful conduct as alleged herein.

## DEMAND IS EXCUSED

63. Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

64. Chiquita is incorporated in New Jersey and New Jersey corporation law therefore governs the issue of whether plaintiff was required to make a demand on the Company's Board

of Directors to institute this case before filing this Complaint. Making a demand is considered futile under New Jersey law if the plaintiff has pled with particularity facts creating a reasonable doubt that a majority of the current Board of the Company are: (1) disinterested and independent, or (2) the challenged transaction was otherwise the product of a valid exercise of business judgment.

65.     Such demand would be a futile and useless act here because the facts alleged herein raise more than a reasonable doubt that the Board's decision to pay a terrorist organization was a product of a valid exercise of business judgment.

66.     As described above, in the Sentencing Memorandum and the Factual Proffer, a majority of the Board made the decision to continue paying the AUC even with knowledge that doing so constituted a federal crime. As the Government stated in the Sentencing Memorandum, "Chiquita is a sophisticated multinational corporation with access to the highest quality business and legal advice. There were a number of points at which the Company could have conformed its conduct to the requirements of the law. *Its failure to do so until late in the evolution of this matter is one of the reasons that the Company appears before the Court having pled guilty to a very serious criminal charge*." (Emphasis added.)

67.     The Sentencing Memorandum, along with the facts pled herein, establish that the Board decided to do business in Columbia and viewed making illegal payments to terrorists as a price of doing business. According to the Sentencing Memorandum, "Chiquita was not without any alternative to paying the AUC. While there may have been alternatives short of withdrawing from Colombia, withdrawal was plainly an option that the Company could have considered when faced with the AUC's demand in 1997. As one of its officers noted in 1997, the Company had a choice about whether to remain in Colombia and make these payments. The officer stated,

'[M]aybe the question is not why are we doing this but rather we are in Colombia and do we want to ship bananas from Colombia.'  In late February and March 2003, defendant Chiquita's outside counsel advised it to stop the payments immediately and recommended that defendant Chiquita withdraw from Colombia.  When the full Board was first advised of the designation of the AUC as a Foreign Terrorist Organization on April 3, 2003, there was discussion in the Board room about defendant Chiquita's withdrawing from Colombia.  Department of Justice officials cautioned defendant Chiquita's senior executives on April 24, 2003, that 'the situation that Chiquita described [was] not a case of true duress because Banadex has a legal option - to withdraw from Colombia.'"

68.     The Director Defendants cannot claim that they made a business judgment to pay the AUC to protect its own employees.  The Government turned this assertion aside in its Sentencing Memorandum stating, among other things: "[i]f defendant Chiquita was solely motivated to protect its Colombian employees from the AUC,

- How did the payments protect the Company's employees during those times when the employees were not working on the Company's farms?

- How did the payments protect the communities in which those employees lived?

- How did the payments protect the families, friends, and associates of the Company's employees?

- What concrete steps did the Company take starting in 1997 to protect its employees from AUC violence, in lieu of making payments to the AUC?

- Why did the Company establish a procedure for paying the AUC in Santa Marta directly and in cash that put a senior officer of Banadex at greater personal risk of physical harm?

- Why did the Company fail to report the AUC's demands to the pertinent United States authorities for years?

- Would the Company have remained in Colombia indefinitely without regard to the profitability of its Colombian operations, just to be able to pay the AUC?"

21

69.    Demand is also excused as futile because the facts pled herein raise a reasonable doubt that a majority of the Board is independent and disinterested. To the extent that the facts pled herein challenge the Director Defendants' failure to act, the Current Directors face a substantial likelihood of liability for deliberately and consciously failing to comply with their fiduciary duties of loyalty, good faith and supervision after being presented with numerous glaring red flags of misconduct in connection with Chiquita's illegal payments to a terrorist organization. As detailed in the Factual Proffer, the Sentencing Memorandum and herein, the Director Defendant repeatedly ignored legal advice of its own counsel and the admonitions of the DOJ to stop paying the AUC. In the face of these evident warnings, the Director Defendants, conscious of the known risks, made the decision to continue operating in Columbia and paying the AUC. Such knowing conduct raises a substantial likelihood of liability that a majority of the Board violated their fiduciary duties of good faith and loyalty to Chiquita and its shareholders.

## BREACH OF FIDUCIARY DUTIES

70.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

71.    Each of the Director Defendants, because of their positions as directors and/or officers of Chiquita Brands, owed fiduciary duties of loyalty to the Company and its shareholders in connection with the management and operations of the Company's business and operations.

72.    To properly discharge these duties, the Director Defendants were required to, among other things:

a.    manage, conduct, supervise, and direct the business affairs of Chiquita in accordance with best practices, and applicable state and federal laws, rules, and regulations;

b.      neither violate nor permit any officer, director, agent, or employee of Chiquita to violate applicable state and federal laws, rules, or regulations; and

c.      remain informed as to the status of Chiquita's business practices, and operations and, including foreign operations and upon receipt of notice of information of imprudent or unsound practices or operations, make a reasonable inquiry in connection therewith, and take steps to correct such practices or operations.

73.     As alleged in detail herein, the Director Defendants willfully and knowingly made decisions that caused the Company to engage in conduct that violated federal law.

74.     Moreover, each of the Director Defendants had a duty to Chiquita and its shareholders to establish and maintain adequate internal controls to ensure that the Company was operated in a prudent and lawful manner. The Director Defendants had an affirmative obligation to install an internal control system to discover wrongdoing, which they had every reason to know or believe existed. Additionally, where such red flags exist, the Director Defendants have an obligation to take affirmative steps to address such issues.

75.     As detailed herein, the Director Defendants abdicated their responsibility to establish and maintain adequate internal controls at Chiquita, having made no good faith effort to fulfill their fiduciary duties in the face of evident red flag warnings of misconduct. The Director Defendants did nothing about the payments they knew were going to the AUC. Rather, they instituted a corporate culture that encouraged unlawful and irresponsible activity resulting in the Company pleading guilty to a federal crime.

76.     As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, Chiquita engaged in unlawful activities causing damage to the Company.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.     Authorizing the maintenance of this action as a derivative action, with plaintiff as derivative plaintiff;

B.     Declaring that the Director Defendants have violated their fiduciary duties to the Company;

C.     Awarding against all of the Director Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Director Defendants' breaches of fiduciary duties;

D.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands trial by jury on all claims asserted herein.


Dated:  October 12, 2007

STRAUSS & TROY

Richard S. Wayne (0022390)
William K. Flynn (0029536)
The Federal Reserve Building
150 East Fourth Street
Cincinnati, Ohio 45202-4018
Telephone:   (513) 621-2120
Facsimile:    (513) 629-9426
E-Mail: (*rswayne@strausstroy.com*)
E-Mail: (*wkflynn@strausstroy.com*)

**COHEN, PLACITELLA & ROTH P.C.**
Stewart L. Cohen
Harry M. Roth
Jonathan A. Saidel
Two Commerce Square, Suite 2900
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 567-3500
Facsimile: (215) 567-6019

**RIGRODSKY & LONG, P.A.**
Seth D. Rigrodsky
Brian D. Long
919 N. Market Street, Suite 980
Wilmington, DE 19801
Telephone: (302) 295-5310
Facsimile: (302) 654-7530

*Attorneys for Plaintiff*

1381197_1.DOC

25

## **VERIFICATION**

Romulo L. Diaz, Jr., on behalf of the City of Philadelphia Public Employees Retirement System ("the City Fund"), verifies that he has reviewed the foregoing Verified Shareholder's Derivative Complaint, and that the allegations as to the Fund and its own actions are true and correct and the other allegations upon information and belief are true and correct.

Dated: October 10, 2007

_____
Romulo L. Diaz, Jr., Esquire
City of Philadelphia Solicitor